JOSIAH HANCOCK AND OTHERS V. W. B. BUTLER.

Every part of an instrument should be harmonized and given effect to, if it can be done. If that cannot be done, and it is found that the deed contains inherent conflict of intentions, then the main intention, the object of the grant being considered, shall prevail.

If a deed, or its parts, are equally capable of two constructions, one consistent with an intention, on the part of the grantor to do that which it was lawful for him to do, and one consistent with an intention to do that which it was unlawful for him to do, the former will be adopted.

The rule that Courts will confer the greatest estate on the grantee, that the terms of the grant will permit, is subordinate to the rule, "that every part of the deed should be harmonized and given effect to, if it can be done."

In a deed to a person, for the term of his natural life, and at his death to his lawful issue forever, the words lawful issue thus employed, are words of purchase, and not of limitation.

Appeal from Smith. Tried below before Hon. J. H. Reagan.

The facts are to be found in the Opinion.

*Selman & Hubbard*, for appellants. I. The donor will not be presumed to do or intend to do an unlawful act.

II. The intention shall govern in the construction of deeds and wills.

III. The technical as well as the natural meaning of the word "issue" is,

1st. A word of "purchase" within itself, especially so when used in deeds, as contradistinguish from wills.

2nd. It will be construed to be a word of purchase in all instruments devising or conveying property, if from the content and the terms used, the intention of the grantor or devisor may be so inferred.

And in support of these propositions, filed an elaborate brief containing numerous authorities to sustain them.

*S. G. Smith*, for appellee, cited the following authorities: Blackstone's Comm. Book 2, p. 172; Cruise Dig. (Greenl. Ed.) Tit. 32, Ch. 40, Sec. 8; Id. Tit. 16, Ch. 7, Sec. 1 and 2; Fearne, p. 221, note; Blackstone's Comm. Book 2, p. 170; Cruise Dig. Tit. 16, Ch. 1, Sec. 19 and note; 1 Doug. 264; 3 Aik. 135; (quoted in Cruise, Vol. 2, p. 214;) Bailey v. Morris, 4 Vesey, 788.; (cited by appellant's counsel in Leigh v. Norbury;) Wild's case, 6 Coke R. 176; (Vol. 3, p. 288.)

. .

ROBERTS, J. Appellants claim the land in controversy as the children of Josiah Hancock, deceased, under the deed of their grandfather, John Hancock, which reads as follows:

"SOUTH CAROLINA, *Edgefield District.*

"Know all men by these presents, that I, John Hancock, of the State and District aforesaid, for and in consideration of the love and natural affection I bear unto and for my beloved son, Josiah Hancock, and for his better support and future convenience, have this day given the following property to the said Josiah Hancock, in the following manner, viz: I give unto said Josiah Hancock two negroes, viz: Jerry, a boy, dark complexion, about eighteen years old, and one girl, Ann, dark complexion, about seven years of age, and for the term of his natural life, and at his death, to his lawful issue forever."

(Then follows a full warranty "unto said Josiah Hancock and his lawful issue.")

Under this deed, appellants claim as purchasers from John Hancock; and the right so to do depends upon whether or not Josiah Hancock took a life estate only in the slaves—and that is the question in this case.

What did the grantor intend by the terms of his deed Was that intention lawful? These are the leading inquirie

to be made. The governing rule is, that every part of the instrument should be harmonized and given effect to, if it can be done. If that cannot be done, and it is found that the deed contains inherent conflict of intentions, then the main intention, the object of the grant being considered, shall prevail. In either event, the result arrived at must be a lawful one. (Rules in Sheppard's Touch., 83, 84 and 85.) In arriving at the intention of the grantor, what he had a right to do, and what he did not have a right to do, should be taken into consideration : for it is to be presumed that he knew his rights, unless we find something in the deed which leads to a different conclusion. He had a right to give his son the property absolutely, either with or without reference to his issue. He had a right to give to his son, Josiah, a life estate only, and connect with it a gift of the absolute property, to take effect at the time of Josiah's death, to persons then in being, answering the description of Josiah's issue.

He had no right to create a perpetuity, by which he would tie up the property from alienation longer than a life or lives in being, and twenty-one years.

He had no right to entail the property, by giving it to Josiah and his issue, to take in a line of succession after one another, contrary to the general laws of descent and distribution.

He had no right (terms are used applicable to real estate, so as to convey the idea,) to reduce the estate, conferred on Josiah, to a life estate, if in the same deed he made the issue of Josiah derive an estate in fee or fee tail from and through Josiah, as his heirs, by descent.

Now, if this deed, or its parts, are equally capable of two constructions—one, consistent with his having intended to do that which it was lawful for him to do—and one, which is consistent with his having intended to do that which it was unlawful for him to do—the former will be adopted.

The part of the deed, which expressly indicates the interest

which Josiah Hancock is intended to take, is plain, and not even capable of being made dubious : "I give unto Josiah Hancock (the slaves) for the term of his natural life." If the deed went no further, or if the full property in the slaves had been given, after that, by the same or another deed, over to the issue of some one else, there could be no doubt that Josiah only took a life estate.

It is contended by counsel for appellee, in an elaborate argument, that this express intention is overborne, and a greater interest than a life estate was conferred on Josiah Hancock, by the mode in which the interest in the property is bestowed on the issue, viz: " at his death to his issue forever ; " that, by the use of these words in the deed, he has done, (whatever he might have intended) some one or all of the three things above designated, which he had no right to do ; and that, therefore, the only legal result, which can flow from the deed so as to give it effect at all, is to cast upon Josiah Hancock the absolute property in the slaves.

To effect this, the rule in Shelley's case is mainly relied on. That is stated to be, " when a person takes an estate of freehold, legally, or equitably, under a deed, will, or other writing, and in the same instrument, there is a limitation, by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs, or heirs of his body, as a class of persons, to take in succession, from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate." (4 Kent, 215.) This result would follow, although the deed might express that the first taker should have a life estate only. It is founded on the use of the technical words, " heirs," or " heirs of his body," in the deed, or the will.

The rule in Shelley's case is said to be a rule of law. It is really an organic rule, entering into the creation of the estate of inheritance. The whole must embrace all its parts. The existence of. the whole being established, or taken for

granted, it cannot be true that a part of the whole is wanting ; that is, if it takes four sides to complete a mansion, its completion being admitted, by a law in physics, it cannot be true that the mansion has three sides only.    In that sense, it is a rule of law.

Without attempting a severely accurate definition, but for purposes of illustration, it may be said, that the law does not permit a grantor to create an inheritable estate, divide it up into sections of certain  or uncertain  periods, and fasten a section thereof upon the first taker, with the reduced dimensions of a life estate only.    That is in violation of the rule by which an inheritable estate is created.    For if a life estate only be clearly granted to the first taker, (as Josiah Hancock in this case,) from all the terms of the deed taken together, then his heirs cannot inherit the estate from him, and it cannot be truly said that he takes an inheritable estate.    The fact, on the other hand, of its being an estate descending to his heirs in succession, is inconsistent with the fact of the first taker's having a life estate only, and, therefore, if it appears, from the deed, that it is by descent from the first taker, that certain persons, as his heirs, must derive their title, then that forces back on him (that from which alone such a result could flow) an inheritable estate with all its attributes ; although other parts of the deed might indicate an effort to confer on the first taker a life estate only.

We are brought to the point then, do the terms of the deed "and, at his death, to his lawful issue forever," standing in the connection they do, give the property to persons, in being at the time of Josiah's death, answering the description of Josiah's issue, they taking as purchasers ? or do they give the property to " the heirs of his body," as a class of persons to take in succession from generation to generation, which would be by inheritance ?

The word issue being the leading feature of this sentence, upon which all the rest concentrates, it is important to fix

some definite meaning to it. It may mean descendants, living at the death of the first taker, or descendants through all future time so long as there are any; it may mean "heirs of the body," or it may mean children. The first point to be settled is into whose hands will the property first go, after the death of Josiah Hancock, and in what proportions, so far as can be gathered from the words lawful issue as they stand in the deed.

It is said, "the word issue, when not restrained by the context, is co-extensive and synonymous with descendants, comprehending objects of every degree. And here the distribution is *per capita*, and not *per stirpes*. This is supported by four cases, (2 Jarman on Wills, 25–6; 3 Vesey, 257,) applying both to personal and real estate, and it is said there is no authority to the contrary. The cases are Davenport v. Hanbury, Freeman v. Pasley, Cooke v. Cooke, Leigh v. Norbury. The last case was a deed of settlement of personal property for A during his life, and after his decease for his lawful issue. (2 Jar. Wills, 25.)

The general rules of property, respecting legal and trust estates, being the same (Fearne, 144, 132, 133, 136) this case, if admitted in all its bearings, would be a strong case in favor of Josiah Hancock, having taken a life estate. For, if at his death all his descendants were to take *per capita*, they would not be either the heirs of his body, or his distributees; that is, not necessarily or usually so. That would present the case of a child and grand-child, and even great-grand-child, all living and each taking an equal part, which would of course be variant from any known laws of inheritance or distribution. And where those that are to take are not the same as those who would be heirs, or heirs of the body, a life estate is created, and the rule does not apply. (Fearne, 148; Cheek v. Day, Id., Archer's case.)

That interpretation of the word issue is founded on its literal meaning, standing by itself. But how can the word be

thus isolated when it is placed in a deed.  If connected with no words, that explain or qualify it, it stands in connection with the general objects of the deed—valuable property is given—it is given to some person, that person is pointed out by a word capable of being understood to relate to several different persons, or classes of persons.  To arrive at what person was intended, it is but fair to ascertain to whom men have generally given, under such circumstances, who have specially designated the objects of their gift.

It is presumed it would be difficult to find one case where a man had expressly given his property, to all his descendants, to take *per capita*—children, grand-children, great grand-children, &c.  The general sense of American mind, as exhibited in deeds, wills, and in Statutes of descent and distribution, is that it is proper to give property to children, grand-children, &c., they taking *per stirpes*.  So we may well presume, in this case, that such persons were meant.  They would be the same persons usually designated by the words, " heirs of the body."  It does not follow, however, that this sentence, with the word issue in it, means the same thing in this deed as it would have meant if " heirs of the body " had been inserted in its stead.  For the words " heirs " and " heirs of the body," in England where both estates in fee and in fee tail exist, have a fixed legal meaning.  They are the appropriate and necessary words to create those estates.  A legal implication arises from them, when used in a deed, over and above their import to designate particular persons ; which is, that the estate is to pass from person to person through succeeding generations, in regular succession.  So that it may be said they have a double import—one, an import of designation ; the other, an import of inheritance.  Strictly speaking they never did have this " import of inheritance " with reference to personal property, for that could not be inherited.

In the States that have inhibited entailment, the words " heirs of the body " are not strictly technical, because they

are not appropriate words to create any estate recognized by law. (Jarvis *et al.* v. Wyatt, 4 Hawks. N. C. R. 227.) In this State it is not even necessary to use the word " heirs " to create an estate in fee. From their indiscriminate use, however, with a recognised meaning derived from the Common Law, they would generally be understood to bear their full import in reference to both species of property. (Choice v. Marshall, 1 Kelly, 97 ; Kay v. Conner, 8 Humphries, 63.)

If a deed or will contain a gift, as in one of the cases just cited, of slaves "to M. F. during her natural life, and to the heirs of her body forever," this is tantamount to the expression " to M. F. during her natural life, and such descendants as the law points out to inherit her estate and who shall hereby take the said slaves by inheritance from M. F." Here at once is presented, by the use of the technical words " heirs of the body," (when fully interpreted, and both of its imports delineated,) a conflict between the first proposition—that M. F. shall take a life estate ; and the second proposition—that the descendants shall take by inheritance from M. F. No sort of construction can reconcile them. It would not do to say the words " heirs of the body " shall be understood in their " import of designation " only, (in which case there would not be a conflict.) That would not be reconciliation—it would be rejection ; it would reject a part, and the most important part, of the meaning of the words fixed by law. If one must be rejected, why reject the first proposition rather than the second ? Because it will confer the greater estate on M. F. The Courts will construe a deed to confer the greatest estate on the grantee that the terms of the grant will permit. For instance, if an estate be granted without any limitation to heirs, and without any period of enjoyment being specified, it will be taken that a freehold for the life of the grantee has been conveyed to him. (2 Blackstone, 94.) By rejecting the first proposition, and retaining the second, an estate in fee tail, instead of a life estate, is conferred upon the first taker,

and his heirs take by inheritance. (Shelley's case, 4 Kent, 214.)

Though against the general rule, " heirs of the body " may be and often have been used with their " import of designation." The English cases in which the general rule is discussed, are too numerous to cite. Chancellor Kent after a review of them says, (4 Vol. 228,) " all the modern cases contain one uniform language and declare that the words ' heirs of the body,' whether in deeds or wills, are construed as words of limitation, unless it clearly and unequivocally appears that they were used to designate certain individuals answering the description of heirs at the death of the party." It will be found however that in some of the States the rule has been abolished by Statute, (Massachusetts, New York, Connecticut, and perhaps others,) and that although it has been generally recognized, the current of decisions in the American States where it has not been abolished bears strongly against enforcing it, unless in cases coming strictly under the rule. They more readily seize hold of any qualifying or superadded words, varying the sense of the technical terms in order to make them words of designation, than is done in England. (English cases of Jesson v. Wright, and Atkinson v. Featherston, given in 2 Jarman on Wills, 285.) (American cases, Prescott v. Prescott's heirs, 10 B. Monroe Kemp, 8 Geo. 385 ; Newell 9 Smede and Marshall, see also 3 Iredell, 200 and 4 Hawks. 227, N. C., Opinion by Judge Henderson ; 9 Ala. R. (new series) 719, Opinion by Ch. J. Collier.)

This difference is to be attributed somewhat to the political connections of the subject in each country. England originally resting on its feudal basis, fostered the strength of the parts and therefrom anticipated the strength of the whole, by an accumulation and perpetuation of property in families. The crown was not in this policy, nor was commerce. The Judges receiving their power from the crown waged a perpetual war against it. Hence then the construction of the

Statute De Donis—their restriction of perpetuities—and the enforcing and expanding the rule in Shelley's case with continually increasing rigidity. In the American States, perpetuities, entailments, and the right of primogeniture were generally prohibited by their written Constitution ; and the antagonism of classes never having existed here, the public mind was at ease on the subject of the encroachments of the power of property. Hence our decisions have not always kept pace with the English decisions in disregarding the qualifying words which formerly in their own Courts took the case out of the rule. (See Opinions of Chief Justice Marshall, 10 B. Monroe, 56, in which he adheres to former decisions and declines to follow the then late case of Jesson v. Wright.)

These remarks are made not in a spirit of opposition to the rule, for it is believed that the rule should be enforced, because it is the law and because it is founded in sound policy. It must be observed and followed whenever and as long as the words " heirs of the body " preserve their double import, both of designation and inheritance. We are now prepared to enter on the question— does the word issue *ex vi termini* possess the double import which is embodied in the words heirs of the body ? Investigation will show that it does not. From its generally comprehending the same class of persons that are the heirs of the body, it is frequently used in that sense and will be so construed to effect the object of the deed or will.

In the case of Cooper v. Collis, Lord Kenyon observed " that issue was either a word of purchase or of limitation, as would best answer the intention of the devisor, though in case of a deed, it is universally taken as a word of purchase." Dum. and East, 299.) So in regard to the word children, Lord Hardwicke remarked, " it must be allowed that children, in their natural import, are words of purchase, and not of limitation, unless it is to comply with the intention of the tes-

tator, where the words cannot take effect any other way." (2 Jar. 226.) The same may be said of the words "child," "son," and "daughter." Gould, J., said that the word issue "comprehends the whole generation, as well as the words heirs of the body; and in his judgment were more properly words of limitation than words of purchase." Lord Talbot said that "issue is not even in legal construction so appropriate a word of limitation as the word heirs." (Fearne, 149.) In Backhouse v. Wells, it is said that "it is to be remembered that the word issue itself, even unattended with any engrafted words of limitation, is often a word of purchase where the word heirs is not." (Fearne, 153.) In King v. Burchill, it was said by Lord Keefe Hewley "that the word issue was naturally a word of purchase ; that the intent was to be collected from the whole will." In the case of Knight v. Ellis, Lord Thurnlow said, "the word issue used in a will, certainly is considered as creating an estate tail, because the context puts on the word an import which it has not naturally ; but in a feoffment it is not a word of limitation." (Fearne, 490 ; see also 4 Ves. Jr. 794; 5 Ves. Jr. 259; 1 Ves. Jr. 142, and notes to 151–2."

But one out of the many American cases will be referred to. In the case of Horne v. Lyeth, decided in Maryland, cited with marked approbation by Chancellor Kent, it is said by Ch. J. Dorsey, "the word issue in grants was exclusively a word of purchase." (4 Kent, 230.)

The word issue may be definite or indefinite : definite, when it means all descendants of one generation ; indefinite, when it means all descendants of a series of generations ; and when the context puts on the word "an import which it has not naturally," by substituting it for the words heirs of the body, it bears neither of these two meanings, but is a constrained compound of parts of both.

The word issue, used in its natural sense, whether definite or indefinite, points to the same persons in all countries.

"Heirs of the body" points to different persons in different countries, just according to the variance in their laws of descent. The words, children, child, son, daughter, have not the double signification of definite and indefinite import possessed by the word issue, and therefore cannot so readily be pressed into the service of and substituted for heirs of the body, as the word issue. And that is all the difference between them. None of them have that artificial signification fixed by law and variant with the laws of each country, as that attaching to "heirs of the body." Their substitution is the work of construction, founded on presumed intention, arising out of the whole context of the deed or will; not in contradiction to and violation of their terms. (2 Jarmon on Wills, 240, 241, and note f.)

On this subject, Lord Thurlow says, in the case of Knight v. Ellis, given in Fearne, 490, note : "Now what do the cases come to ? A man devises by his will to A. for life; there being plainly an intent only for life given; if that were all, the disposition would end there as to A., and any other would be effectual after his death. The testator then gives the same fund over to B., after a failure of issue of A. What is the Court to do ? It is clear a life interest only is given to A. It is clear that there is no benefit given to B., while there is any issue of A. The consequence is, that, as no interest springs to B., and no express estate is given after the death of A., the intermediate interest would be undisposed of unless A. were considered as taking for the benefit of his issue, as well as himself; and as the words in this case are capable of such amplification, the Court naturally implies an intention in the testator that A. should so take, that the property might be transmissible through him to his issue, and he was therefore considered as taking an estate tail, which would descend on his issue. Now an estate in chattels is not transmissible to the issue in the same manner as real estate, nor capable of any kind of descent; and therefore an estate in chattels, so given from the necessity of the thing, gives the whole interest to the

first taker ; but if the testator, without leaving it to the necessary implication, gives the fund expressly to the issue, they are not driven to the former rule, but the issue may take as purchasers ; and then there is an end of the enlargement, of any kind, of the estate of the tenant for life ; for another estate is given after his death, to other persons who are to take by purchase; it no longer rests on conjecture." It may be added that there is no room left for construction.   The life estate is expressly given to the first taker ; the absolute property is expressly given to his issue ; they stand in harmony together ; there is no inherent import of inheritance in the word issue, standing alone, which would make it necessary to reject a part of the deed—to-wit : that part giving expressly the life estate, as would be the case if " heirs of the body " alone were so used.

The rule, then, that Courts will confer the greatest estate on the grantee that the terms of the grant will permit, must necessarily be subordinate to the rule " that every part of the deed should be harmonized and given effect to, if it can be done."

If then in this gift to Josiah Hancock, " for the term of his natural life, and at his death to his lawful issue forever," the word issue can be read as a designation of persons, to take at his death, every word and sentence of the deed will be given effect to, and both Josiah, and those persons after him, will take as purchasers.

To presume it to have been used in another sense, is to erase out of the deed one whole sentence plainly expressed, to-wit : " for the term of his natural life ; " is to make the donor do that which is in violation of law, in making an estate tail ; (which will not be readily presumed.   See 15 Ga. R. 145–6;) and is in direct violation of the manifest intention of the donor. And all this upon a presumption that issue is used in a sense " which it has not naturally."   (Moss v. Shelden, 3 Watts & S. 160.)

The word forever is the only part of the deed which could give any plausibility to the view ; that issue was used as a word of limitation.  But, upon weighing all the words of both parts of the gift, it will be seen that it relates to the property given, and not to the persons taking ; as the amount of interest given to Josiah, to-wit : a life estate, was expressed by words of time, viz : " for the term of his natural life," so the amount of interest given to the issue, to-wit : the absolute property, was also expressed by a word of time, viz : " forever."

Were it dubious, whether forever related to the property or the persons, the rules we have laid down would favor the construction that has been given, as it would best give effect to all the words of the deed, and reject none.  Again, if a different view be taken, " forever " will come in conflict with the words, " at his death."  Apply " forever " to the persons, and the gift extends itself to them from generation to generation throughout all time, (and creates an estate tail, if such a thing were lawful,) and that would be wholly in conflict with the idea expressed in the deed that the gift is to exhaust itself on persons " at his death."  The words, " at his death," have always been held to be extremely pertinent and of controlling force to indicate the persons to take as purchasers.  (See case of Warman v. Seaman, cited in Fearne, 495 ; also Payne v. Stratton, Id. 493 ; 2 Jarman, 240, and note ; Id. 360 ; see also Kent's Rule, 4 Kent, 228.  See Statute of 1837 in England, making other words to be construed " at his death," 2 Jarman, 296.)  This applies equally in gifts directly to issue, as well as in limitations over, after failure of issue ; at the death of the first taker, which is a gift to the issue by implication. (Besides cases above, see Leigh v. Norbury, 13 Ves. Jr. 338 ; 9 Ala. R. 719, Opinion by Ch. J. Collier ; 3 Iredell, 200 ; 4 Hawks, 227 ; Kemp v. Daniel, 8 Ga. 385 ; 6 Serg. & Rawl. 28 ; 2 Id. 59 ; 4 Iredell, 93 ; Dudley, 207 ; 10 B. Monroe, 188 ; 16 Johnson, 381 ; Carlton v. Price, 10 Ga. 495 ; Dun v. Davis, 9 Ala. 135 ; 4 Monroe, 223.)

If these principles be established, the issue of Josiah Hancock took as purchasers at his death.

An analogous authority in support of the whole case is Leigh v. Norbury, (13 Ves. Jr. 338,) in 1807, which is a case of marriage settlement relative to personal property, and which was a settlement to "H. W. during his natural life, and from and immediately after his decease (subject to an appointment which was never made, and in default thereof,) to his lawful issue." H. W. had made a will before he made this settlement. It was held by Sir W. Grant that all his issue took under the settlement, notwithstanding the will, which, it is submitted, could not have been the case if the right to the property had returned to him, or rather had never left him, by force of the words "lawful issue" in the deed.

The English case relied on by appellee's counsel, (Roe & Doom v. Grew, 2 Jarm. 245,) is a devise to G. for his natural life, and after his decease to the use of male issue and for want of such over, &c. Held that it created an estate tail, on the ground that as long as he had male issue the estate should not go over. The strongest case found is Attorney General v. Bright, (2 Jarm. 353,) where the gift was to A. during her life and then to her issue, but, in case of her death without issue, then over, &c. Held that the property vested in A. upon the same ground as in the preceding case. It is evident that in neither of these cases were the words used construed to mean failure of issue "at his death." Mr. Fearne (495) says : "A limitation of a term to A. and to her issue, it seems, vest the whole in A., if the devise rests there ; though the addition of the subsequent words—and if A. die and leave no issue— Lord Hardwicke said, related to any child living at A.'s death ; and consequently the word issue there was considered as a word of purchase." The great controversy has been, not the effect of the words "at his death," in this connection, but what words were tantamount thereto. (2 Jarm. 240.) And to ob-

viate the difficulty a declaratory Statute was enacted in England in 1837. (2 Jarm. 296.) Before this Statute, it had got to be the case that few expressions could be framed that would be held to be of similar import to that conveyed by "at the death." And it must have been under that view that the case of Kingsland v. Rapelye and wife, (3 Edwards, Ch. R. 1, N. Y.,) was decided. The words there were " to D. T. E. during the term of her natural life, and upon her decease unto the lawful issue of D. T. E., his, her and their heirs, &c., forever, equally to be divided among them, share and share alike." The Vice Chancellor held that the property vested in the first taker absolutely. His opinion rests upon King v. Melling, (1 Vent. 225,) and Rose v. Grew, (2 Wils. 222,) to establish that the words "lawful issue" in that will, stood in the place and had the same force as the words "heirs of the body." In both of those cases the words "after his decease" were used, and no reference is made to the difference that might exist between such words and the words used in the will before him, viz : "upon her decease," and they are therefore treated as amounting to the same. In that point of view, then, this case stands upon the same ground as the cases already disposed of, (one of them being the same.) Further, his opinion rests upon Mog v. Mog, (1 Mer. 654,) and Jesson v. Wright, (2 Bligh. R. 1,) to reject the superadded words, " to be equally divided among them, share and share alike," in the will before him, as furnishing no reliable indication that the testator had in his mind a designation of persons when he used the words lawful issue. The case of Mog v. Mog has the same words already commented on—"after the decease" of such child or children. The case of Jesson v. Wright, not only had the words " after his decease," but also "heirs of his body," in the will, upon the force of which the words "share and share alike," were rejected as inconsistent with the legal effect of the technical words, "heirs of the body." It is sufficient, without further notice of the four cases upon which that decision is based, to

say that none of them conflict with this case, in which the words used are, "at his death."

A case very strongly in point, in favor of the view we take is Carlton & Carlton v. Price, (10 Ga. R. 496.) The words in the will are "to C. during his natural life, and at his death to the lawfully begotten heirs of his body, &c.; if C. shall die without an heir, then the negroes to be set free at his death." Warner, J., in delivering the Opinion, lays great stress upon the time when the bequest should be consummated—at his death—in determining that even "heirs of his body" were used to designate persons to take as purchasers. The same is decided in Kemp v. Daniel, (8 Ga. R. 386.) A case strikingly in contrast with the case from 3 Edwards, above cited, is 9 Ala. R. 719, in which the words, "to M. F. during her natural life, and at her death to the lawful issue of her body that may then be living, share and share alike, &c., forever." The Chief Justice, in delivering the Opinion, held that the issue took by purchase, and said it is manifest that the estate should rest in her heirs at her death.

But one more case will be stated, which is Newell v. Newell et al., (9 Sme. & Mar. 56,) which is made on a will executed in the State of South Carolina, (where this deed was made,) and based on a full review of the decisions of that State. The words, "I give and bequeath to my daughter, Mary, a negro, &c., to her and the heirs of her body—during her life. Should she die without an heir, her part to go to her brothers." Justice Clayton held that the limitation over to her brothers was not too remote, and it follows as a consequence of this that Mary took only a life estate. To support this case upon prin ciple, to the words "should die without an heir," must be added by implication, living at the time of her death. As strong cases as this are quoted from South Carolina, the last and most extreme one of which was sustained by a divided Court only But the one upon which they mainly rest their decision, is very pertinent to this case in one respect ; the words of which are,

"to M. and her heirs," and in another part of the will, "if one or more of my children should die without issue, then his, her, or their part shall be equally divided between the surviving brethren." Upon which Justice Clayton remarks : "No difference is perceived between this and the present, unless in the use of the word surviving, as indicating the period at which the limitation was to take effect. In this case the property is to go to the brothers ; the intention is equally manifest, as if the word surviving had been inserted."

Other cases may be cited showing that not only the time at which the gift is to take effect, but also superadded words of qualification may be considered in determining whether or not the words, "heirs of the body," are used as a designation of persons to take as purchasers, especially in cases concerning personal property. (Prescott v. Prescott's heirs, 10 B. Monroe, 56 ; Swain v. Roscoe, 3 Iredell, 200 ; Jarvis et al. v. Wyatt, 4 Hawks, 227 ; Dunn et al., v. Davis, 12 Ala. Rep. 135.) These American cases are brought forward, not for indiscriminate adoption, but to make manifest, by the current of decisions, that the taking effect of the gift at the death of the first taker, is an important fact in favor of the persons being designated as purchasers, even where the technical words, "heirs of the body," are used, and more controlling, of course, when the word issue is used. The case of Polk et al. v. Farris, (9 Yerg. 210,) cited for appellee, does not stand in the way of this decision. Its application to this case is upon the assumption, not admitted, that lawful issue in this deed means the same as though it were written "heirs of the body."

The reasons then that this case does not come under the rule in Shelly's case, are :

1st. The technical words on which the rule is founded— "heirs," or "heirs of the body"—are not used in the deed.

2nd. The word issue, (without straining it out of its appropriate signification,) which is used, may be understood in a

sense not conflicting with that part of the deed which gives Josiah Hancock a life estate only, and to give effect to the whole, it will be taken to have been used in that sense.

3rd. The gift to the issue at the death of Josiah, is strongly indicative that the word issue was used in the sense of designation of persons then to take the absolute property, which would make them take as purchasers.

What is decided now, is—that the words "lawful issue," as they stand in this deed, are words of purchase, and not of limitation. No other question having been made, none other will be decided.

This decision is made upon the best examination that our time will admit of at present, and is attempted to be based upon principle, as well as upon authority, so as to furnish a definite rule. The refined distinctions between personality and reality, equitable estates and legal estates, have not been gone into. The subject not having been exhausted, the case has been the more readily given the present direction, because by taking that course it can be more thoroughly examined into hereafter, if it shall be found necessary. The decisions of South Carolina, where the deed was made, are not now directly accessible to us ; nor are the laws of that State set out in the pleadings. How far that should be done, and how far the rights of the respective parties may have been affected by the Registry Acts of South Carolina, Alabama and Texas, are matters which may be involved in the merits of the case, but not being before us are not decided upon.

The Court erred in sustaining appellee's exceptions to appellant's petition.

Judgment reversed and the cause remanded.

Reversed and remanded.